<div style="float:right">PAGE<br>*vs*<br>HUGHES *et al.*<br><br>the time of openly renouncing the trust and claiming adversely *to the cestui que trusts.*</div>

---

## Page *vs* Hughes *et al.*

APPEAL FROM THE LOUISVILLE CHANCERY COURT.

*Specific performance. Lapse of time. Election.*

CHIEF JUSTICE ROBERTSON delivered the Opinion of the Court.

<div style="float:right">CHANCERY.<br><br>Case 138.<br><br>June 1.<br><br>The case stated.</div>

ON demurrer, the Chancellor dismissed a bill filed by *Page*, as remote agsignee of a written agreement for a conditional sale and conveyance of 46 feet of ground in Louisville, from *James Hughes* to *Bland and Coleman.* And this appeal seeks the reversal of that decree.

The contract purports to be a lease for the term of ten <span style="float:right">The contract.</span>

years, commencing on the 1st of October, 1830, and ending on the 1st of October, 1840, with a reservation of annual rent, and with stipulations for improvements, entry and distress, and concluding with the following covenant: "the said party of the first part doth agree to "sell the said demised premises to the said parties of the "second part, their heirs or assigns, at any time before "the expiration of the lease, in case they or their heirs "or assigns shall pay to the said Hughes, his heirs or "assigns, $2300, coin of the United States, and, upon "the payment thereof, the said Hughes, his heirs or as- "signs, shall convey the said demised premises, with "general warranty," &c.

The annual rent, as reserved, was precisely equal to the legal interest per annum, of the stipulated considera- tion of the conditional sale, and may be presumed to have been regularly paid.

On the 22d of October, 1840, 21 *days after the expi- ration of the prescribed term, Hughes* having previously died intestate, *Page,* as ultimate assignee of the forego- ing contract, filed a bill against the administrator and heirs of the decedent, praying for a specific execution of the covenant of sale and conveyance; in which bill he alledged that the entire contract was intended by the par- ties to it to be an absolute sale, but was made to assume the form of a lease and conditional sale, for affording to *Hughes* ample and satisfactory security; that *Page* had built, on the two fronts of the lot, two four-storied brick houses, which cost him about $12,000; that he intended to pay the $2300 within the term, but that the adminis- trator was unwilling to receive it, being of the opinion that the heirs alone were entitled to it, and also, that the heirs were non-residents, and many of them infants, so that he did not know how, where, or to whom to make payments.

The administrator admitted the allegations of the bill, and admitted also, that the intestate had always consid- ered the contract as one of sale.

Decree of the Court below. The infant heirs, by their guardian *ad litem,* resisted the specific execution, and others of the heirs having de- murred, the case was decided on that demurrer.

If this case be irremediable in equity, it is certainly a very hard and anomalous one.

Do the principles of equity, rightly understood and safely applied to the facts, require such an oppressive forfeiture on one side, and great speculation on the other? The Chancellor thought they did. We think they do not.

It may be conceded that the contract, on its face, imports a lease and a covenant to sell and convey for a stipulated price, at the election of the covenantees or their assigns, within the term of ten years, and consequently we may concede that the contract of sale was not obligatory on the lessees or their assignee, *Page*, and was not, therefore, mutual, especially after the expiration of the period prescribed for the election. This construction, which more than one consideration shakes, places the case in the most favorable aspect for the appellees. But even thus considering the contract, without question or scruple, we cannot avoid the conclusion that the demurrer ought to have been overruled.

When there is a want of mutuality in the obligation, time is generally essential and indispensable in equity, as well as according to strict and inflexible law. And, if *Page* had intentionally or negligently failed, either to elect or manifest his election, and offer to pay the $2300, on or before the 1st of October, 1840, he should submit to the loss of his buildings, great as it might be. Equity ought not to help him from a forfeiture thus voluntarily incurred.

*Generally when there is a want of mutuality in contracts of purchase, time is essential as well in equity as at law.*

But the facts of the case will allow, no doubt, that when he built the houses, he elected to take the lot as a purchase, and determined to pay within the prescribed term, the stipulated price. Nor can there be any doubt that *Hughes* himself so understood.

The bill also, though the allegations are general and vague, may be understood as importing that *Page* had offered, directly or indirectly, to pay the $2300 to *Hughes'* administrator before the expiration of the ten years; at least proof of that fact specifically, might be admissible consistently with the allegations. And moreover, all allowable deductions from the allegations being admitted by the demurrer, we are satisfied that, on the issue of

*A demurrer should not be sustained to a bill against administrators and heirs, making such allegations as if confessed by the intestate, would have authorized and required a decree*

law, the bill ought to be considered as alledging, not only a willingness, but an offer, virtual or actual, to pay the $2300, on or before the 1st day of October, 1840. Be. sides the demurrer admitted the express allegation that the parties to the contract intended it as an unconditional sale. An express admission to that effect, by *Hughes*, had he survived and answered the bill, would have authorized a decree for a specific execution, without any ne. cessity for resorting to testimony forbidden by the statute of frauds and perjuries.

Even upon these grounds, therefore, the demurrer ought, as we think, to have been overruled.

A lapse of 21 days from the time a party who was lassee, had to elect to purchase a lot, not regarded as forfeiting the right to do so under contract, when a reasonable excuse was given for such delay, viz: death of obligee, refusal of administrator to receive the purchase money & non-residence of some and infancy of others of the heirs.

But there is another and more comprehensive reason why, in our opinion, the Chancellor acted prematurely in dismissing the bill, and that is this, that, if there had been no formal offer to pay the consideration within the prescribed term, there was apparently a reasonable excuse for the omission, and the appellees cannot be injured by the slip of 21 days.

In cases of covenants to renew leases at the election of the lessees, to be manifested within a prescribed time, courts of equity have recognized the doctrine that a lessee cannot coerce a specific execution if he voluntarily or negligently failed to elect within the limited period: *Armiger* vs *Clark*, (*Bunb.* 111;) *The city of London* vs *Milford*, (14 *Vez.* 58.) But in *Bateman* vs *Murray*, (1 *Ridgw.* 170,) *Lord Thurlow* said that "accident or misfortune, which he could not prevent, by means whereof he was disabled from applying for a renewal at the stated times, according to the terms of his lease," might save a forfeiture and entitle him to a specific execution. And this seems to us to be perfectly consistent with the phylosophy and harmony of equitable jurisprudence. It is recognized too, *by the master of the Rolls*, in the subsequent case of *Rawstorne* vs *Bentley*, (4 *Brown's Chy. Rep.* 417,) and is fortified by the liberal spirit which characterizes that case. And is it not also corroborated by the principle of the adjudged cases in which parties have been relieved from forfeitures resulting from a noncompliance with express conditions, when there was

neither negligence nor injurious delay, and full compensation could be undoubtedly made?

Then, according to these principles, what is the equitable aspect of this case, upon the meagre facts now imperfectly exhibited? The heirs, and not the administrator, had the technical right to the price of the lot. The administrator, therefore, *after consulting counsel*, determined that he would·not receive the money. Why did he consult counsel unless he knew that *Page* intended to pay the money? *Page* could not, therefore, pay the money to the administrator. How could he pay it to the heirs, non-resident, scattered and unknown; and many of them infants? Besides, he was not bound to make payment without obtaining a perfect conveyance with warranty; and that he could not have procured without a suit in Chancery. That suit he therefore brought. Must he forfeit to those heirs his valuable buildings only because his bill was not filed against them on the 1st instead of the 22d of October? We think not. Could he have found them all and had he offered to them the money, they would have had no right to it without making to him a conveyance, which he ought not to have received. Their absence and disabilities were no faults of his. How then can it have been material to them whether the suit, which their condition rendered unavoidable, had been instituted 21 days sooner than it was? There is no ground for imputing to *Page* bad faith, culpable negligence, or a voluntary non-compliance with the letter of the contract of sale. And there can be no doubt that he had long determined and was anxious to consummate that contract and secure his costly improvements. It seems to us that the facts would not authorize the presumption that he would not have tendered the $2300 to Hughes, within the ten years, had he survived to the end of that time.

These facts constitute a sufficient excuse for his failing to pay or tender the money on or before the 1st of October, 1840. And, as a suit became indispensable, the bringing of it on the 1st of October could not have been material to the interests of the heirs, because, without the suit, there could have been no doubt as to his having elected to pay for the lot and receive a conveyance of the

title; and, therefore, the heirs could not have been subjected to any vexation or loss by uncertainty as to what he had determined to do and would do, whenever they should be willing and able to comply with their father's covenant to make a title. Under the circumstances of the case, the filing of the bill within the term of ten years, was material for no other purpose than that of manifesting an election to buy and an offer to pay for the lot on the prescribed terms. As already suggested, that election had been long before clearly indicated by unequivocal acts. Those acts, it is true, did not bind Page—nor would even the filing of a bill, within the ten years, have bound him; for had he filed it on the 1st, he might have dismissed it on the 2nd of October; and, interpreting the stipulation respecting a sale as altogether unilateral, neither *Hughes* nor his representatives could ever have coerced the conventional price. The only mode of selling it was an elective payment of it. Had the payment been made or tendered within the prescribed period of election, there could have been no escape from the obligation to convey the lot. If there be no such obligation now, or if it may be eluded, the only reason for such a conclusion must be *Page's* failure to pay or tender the $2300 on or before the 1st of October, 1840. That failure does not appear to have been elective or voluntary, but rather seems to have been a consequence of circumstances beyond his control, and resulting from the conduct or condition of the representatives of *Hughes*.

The utmost, therefore, that *Page* could have done on the 1st of October, was to manifest, in some mode, *his election* to take the lot as purchaser, and offer to pay for it. The filing of a bill was certainly not the only effectual mode of either making or announcing that election or offer. The purpose of the suit is to enforce an election previously made, and which, though not perhaps announced in words, because there was no person able or willing to respond, was yet most emphatically and intelligibly expressed by acts unequivocal and conclusive as to the fact of election to purchase, and only equivocal or inconclusive as to the intention to pay the price within the prescribed time. But this want of certainty as to a

payment or tender within the ten years, if the condition of *Hughes'* representatives had either permitted or rendered such an act necessary, could not have been conclusively obviated by the filing of a bill on the 1st of October, 1840, with even an accompanying offer also to pay the money, which could not have been binding until accepted. Such an offer would not have proved either that *Page* then had the money or would have paid it within the prescribed time to any person or persons qualified to receive it and make the conveyance. The filing of such a bill within the term, would have been more prudent and safe than the course which has been adopted; *but it would not have been more beneficial to the representatives of Hughes nor insured to them an earlier or a more certain payment of the* $2300.

It does appear to us, therefore, that *Hughes'* representatives cannot, with a good conscience or grace, insist on a forfeiture to themselves of *Page's* houses, and that he might yet obtain a decree for a conveyance of the title to the lot without violating any doctrine of equity or principle of justice.

But if there might be any doubt as to his equity, upon the facts now exhibited, it may, perhaps, be removed by an amendment of the bill, or by proof of facts not now clearly appearing.

Whatever may be the ultimate result of this suit, it is our opinion that the demurrer ought to be overruled, the case permitted to be fully prepared, and that such decree should be rendered on the merits, as shall finally appear to be equitable, according to the principles of this opinion.

Decree reversed and cause remanded.

*Guthrie* for appellant; *Pirtle and Thruston* for appellees.

Where the assignee of a lease for 10 years, with the privilege of then taking the property at a stipulated price, makes considerable improvements thereon, indicating an intention to purchase, and the lessor die, & the heirs are some infants, others non-residents, and the adm'r. refuse to receive the purchase money, & no suit is brought for 21 days after the expiration of the lease, it violates no principle of equity or justice to say there is no forfeiture of the right to purchase and hold the premises.