## THOMAS ET AL. v. HEDDON ET AL.

[No. 22,947. Filed November 28, 1916. Rehearing denied January 30, 1917.]

SPECIFIC PERFORMANCE.—*Option to Purchase.—Conditions Precedent.—Performance.*—It is not incumbent upon lessees to leave the state for the purpose of indicating an election to purchase under the terms of a contract for the lease of real estate with an option attached for the purchase thereof, hence, where all parties to whom the election to purchase and the payment of the money could have been made were nonresidents of the state, any ineffectual effort of lessees outside of the state to make their election, tender the purchase price and demand a deed does not bar their right to a decree for specific performance, their action having been instituted within five days after the expiration of their option and all persons having an interest in the real estate having been made parties to the action.

From St. Joseph Circuit Court; *Walter A. Funk,* Judge.

Action by George A. Thomas and others against Etta K. Heddon and others. From a judgment for defendants, the plaintiffs appeal. (Transferred from the Appellate Court under §1405 Burns 1914, Acts 1901 p. 590.) *Reversed.*

*Perry L. Turner* and *Anderson, Parker, Crabill & Crumpacker,* for appellants.

*Charles W. Miller, Hubbell, McInerny, McInerny & Yeagley* and *George T. Buckingham,* for appellees.

ERWIN, J.—This action was brought by appellants to compel specific performance of a contract for the lease of certain real estate with option attached for the purchase of said real estate, on October 1, 1911. Trial was had by the court, and special findings of fact were made, conclusions of law stated thereon in favor of defendants, appellees herein, and judgment was rendered accordingly. Errors relied on for reversal are with

others that the court erred in each of its conclusions of law from 1 to 9, inclusive.

The facts found by the court are in substance as follows: On September 29, 1899, John McNaughton, since deceased, was the owner of a certain block of real estate in the city of Elkhart, Indiana. On said date McNaughton entered into a written contract with appellant George A. Thomas and his father, Warren H. Thomas, which written contract was duly acknowledged and recorded, by which he leased the property above mentioned to George A. and Warren Thomas for the period of twelve years from October 1, 1899. The lessees covenanted to pay rent for the leased premises at the rate of $85 per month in advance on the first of each month; to pay all taxes and assessments against the property as the same might become due; to keep the buildings upon the premises in good condition and insured in the sum of $6,000; and to pay insurance policies upon the same or any additional buildings which might be built thereon. The lessees were given the right to make alterations, additions and changes on the building upon the leased property, and the lessor agreed to furnish a sum not to exceed $5,000 to be used in the erection of a substantial two-story brick building on the west half of the leased lot. The lessees were to furnish the remainder of whatever would be necessary to construct the building. The lease further provided that the lessees might, at their option, purchase the leased premises on October 1, 1911, for the sum of $17,000 and, upon the payment of said sum, the lessees were to receive a deed of general warranty for said lot conveying the premises to them, their heirs or assigns.

Under the terms of said lease the lessees went into possession of said lot and did expend sums of money in improving said property. The lessee Warren H.

Thomas died some time afterwards, testate, leaving all his property and rights in the lease to his wife, Emma F. Thomas, who afterwards, but prior to the death of McNaughton, assigned her right and interest in the lease to appellants, George A. Thomas and Edna B. Thomas.

The lessor John McNaughton died testate on April 5, 1911. His will was duly probated and appellee Joseph H. Defrees was nominated the executor thereof. Testator made nineteen bequests to as many different persons of specific sums of money and made provision for Etta K. Heddon, which he afterwards changed by codicil. He made Harriet McNaughton Defrees, his niece, residuary devisee. On September 30, 1911, appellant George A. Thomas went to Chicago, Illinois, and there met the executor and his wife, Harriet Defrees, the residuary devisee, for the purpose of exercising his option to purchase the premises under his option. He had with him the sum of $17,000 in currency which he exhibited to Mr. and Mrs. Defrees, and the question as to whom the money should be paid—whether to the executor or to Mrs. Defrees as residuary devisee—was discussed, as was also the character of the deed that should be executed for the conveyance of the property. The first day of October being Sunday, it was agreed that negotiations were to go over until Monday, October 2. On the last-named date the assignment from Emma F. Thomas to George A. Thomas and Edna B. Thomas was handed to Mr. Defrees. Mr. Thomas then said he was there to make a tender to Mr. Defrees, as executor of the will, and requested a deed to the property, and that if he could not make him a deed, to have one furnished for him. At the same time the money was handed to Mr. Defrees. He said he did not believe he had a right to take it, and he did not accept it. Mr. Thomas then said that the money would be on deposit in

the First National Bank of Elkhart, Indiana, when he, Defrees, was able to furnish a deed. A suggestion was made by attorney for Mrs. Defrees that, if a tender was made to her, he would advise that she accept it and give her quitclaim deed to the property therefor. The money was then tendered to Mrs. Defrees, conditioned that she give a warranty deed for the property. The money was then, later in the day, tendered to Mr. Defrees, and it was said to him in substance that he, Thomas, made the tender on behalf of the appellants and that he demanded of him, as executor, that he perform the conditions of the contract. Mr. Defrees took the money, but later returned it. The attorney for Mrs. Defrees said he had a quitclaim and a warranty deed to the property and was ready to deliver either one for the $17,000. The warranty deed was read and found to be a special, or limited, warranty. At said time certain heirs of John McNaughton were threatening to bring suit to contest his will. These facts were known to both appellants and appellees.

The said lessees paid all the taxes, insurance and repair bills mentioned in said instrument and paid all the rentals referred to, to John McNaughton until his death and from that time until October 1, 1911, they paid said rentals, according to the terms of said instrument, to Harriett M. Defrees. The improvements were made upon said real estate according to the terms of the instrument. The will of John McNaughton, together with a codicil thereto, was probated in said county on April 8, 1911, and Joseph Defrees was named as executor in said will and qualified as such. The court found that all parties to whom election to purchase and the payment of the money could have been made were nonresidents of the State on October 1, 1911.

It was not incumbent upon appellants to leave the State for the purpose of indicating an election to pur-

chase, under the terms of their contract. *West* v. *Chase* (1852), 3 Ind. 301, 303; *Beckett* v. *Bledsoe* (1853), 4 Ind. 256. It must follow that any ineffectual effort outside of the State to make his election to purchase and tender the purchase price and demand a deed could avail appellees nothing, or weigh against appellants so as to bar their right to a decree for specific performance, where as in this case they brought their action within five days after the expiration of their option to purchase and made all persons in any wise interested in the real estate in question parties to the action. *Page* v. *Hughes* (1842), 41 Ky. (2 B. Mon.) 439. The case last cited seems to so completely state the rules applicable in this case that we include herein what was said by the court in that case, to wit: "In cases of covenants to renew leases at the election of the lessees, to be manifested within a prescribed time, courts of equity have recognized the doctrine that a lessee cannot coerce a specific execution if he voluntarily or negligently failed to elect within the limited period: *Armiger* v. *Clark,* (Bunb. 111;) *The City of London* v. *Milford,* (14 Vez. 58.) But in *Bateman* v. *Murray,* (1 Ridgw. 170,) Lord Thurlow said that 'accident or misfortune, which he could not prevent, by means whereof he was disabled from applying for a renewal at the stated times, according to the terms of his lease,' might save a forfeiture and entitle him to a specific execution. And this seems to us to be perfectly consistent with the philosophy and harmony of equitable jurisprudence. It is recognized too, *by the master of the Rolls,* in the subsequent case of *Rawstorne* v. *Bentley,* (4 Brown's Chy. Rep. 417,) and is fortified by the liberal spirit which characterizes that case. And is it not also corroborated by the principle of the adjudged cases in which parties have been relieved from forfeitures resulting from a noncompliance with express

conditions, when there was neither negligence nor injurious delay, and full compensation could be undoubtedly made?

"Then, according to these principles, what is the equitable aspect of this case, upon the meagre facts now imperfectly exhibited? The heirs, and not the administrator, had the technical right to the price of the lot. The administrator, therefore, *after consulting counsel,* determined that he would not receive the money. Why did he consult counsel unless he knew that *Page* intended to pay the money? *Page* could not, therefore, pay the money to the administrator. How could he pay it to the heirs, nonresident, scattered and unknown, and many of them infants? Besides, he was not bound to make payment without obtaining a perfect conveyance with warranty; and that he could not have procured without a suit in Chancery. That suit he therefore brought. Must he forfeit to those heirs his valuable buildings only because his bill was not filed against them on the 1st instead of the 22d of October? We think not. Could he have found them all and had he offered to them the money, they would have had no right to it without making to him a conveyance, which he ought not to have received. Their absence and disabilities were no faults of his. How then can it have been material to them whether the suit, which their condition rendered unavoidable, had been instituted 21 days sooner than it was? There is no ground for imputing to Page bad faith, culpable negligence, or a voluntary non-compliance with the letter of the contract of sale. And there can be no doubt that he had long determined and was anxious to consummate that contract and secure his costly improvements. It seems to us that the facts would not authorize the presumption that he would not have tendered the $2,300 to Hughes, within the ten years, had he survived to the end of that time.

"These facts constitute a sufficient excuse for his failing to pay or tender the money on or before the 1st of October, 1840. And, as a suit became indispensable, the bringing of it on the 1st of October could not have been material to the interests of the heirs, because, without the suit, there could have been no doubt as to his having elected to pay for the lot and receive a conveyance of the title; and, therefore, the heirs could not have been subjected to any vexation or loss by uncertainty as to what he had determined to do and would do, whenever they should be willing and able to comply with their father's covenant to make a title. Under the circumstances of the case, the filing of the bill within the term of ten years, was material for no other purpose than that of manifesting an election to buy and an offer to pay for the lot on the prescribed terms. As already suggested, that election had been long before clearly indicated by unequivocal acts. Those acts, it is true, did not bind Page—nor would even the filing of a bill, within the ten years, have bound him; for had he filed it on the 1st, he might have dismissed it on the 2nd of October; and, interpreting the stipulation respecting a sale as altogether unilateral, neither Hughes nor his representatives could ever have coerced the conventional price. The only mode of selling it was an elective payment of it. Had the payment been made or tendered within the prescribed period of election, there could have been no escape from the obligation to convey the lot. If there be no such obligation now, or if it may be eluded, the only reason for such a conclusion must be Page's failure to pay or tender the $2,300 on or before the 1st of October, 1840. That failure does not appear to have been elective or voluntary, but rather seems to have been a consequence of circumstances beyond his control, and resulting from the conduct or condition of the representatives of Hughes.

"The utmost, therefore, that Page could have done on the 1st of October, was to manifest, in some mode, his election to take the lot as purchaser, and offer to pay for it. The filing of a bill was certainly not the only effectual mode of either making or announcing that election or offer. The purpose of the suit is to enforce an election previously made, and which, though not perhaps announced in words, because there was no person able or willing to respond, was yet most emphatically and intelligently expressed by acts unequivocal and conclusive as to the fact of election to purchase, and only equivocal or inconclusive as to the intention to pay the price within the prescribed time. But this want of certainty as to a payment or tender within the ten years, if the condition of Hughes' representatives had either permitted or rendered such an act necessary, could not have been conclusively obviated by the filing of a bill on the 1st of October, 1840, with even an accompanying offer also to pay the money, which could not have been binding until accepted. Such an offer would not have proved either that Page then had the money or would have paid it within the prescribed time to any person or persons qualified to receive it and make the conveyance. The filing of such a bill within the term, would have been more prudent and safe than the course which has been adopted; but it would not have been more beneficial to the representatives of Hughes nor insured them an earlier or more certain payment of the $2,300.

"It does appear to us, therefore, that Hughes' representatives cannot, with a good conscience or grace, insist on a forfeiture to themselves of Page's houses, and that he might yet obtain a decree for a conveyance of the title to the lot without violating any doctrine of equity or principle of justice.".

We are of the opinion that the court erred in its conclusions of law. It is therefore ordered that this

judgment be reversed, with instructions to the court below to restate its conclusions of law in favor of appellants and to appoint a commissioner to make conveyance of the real estate in question to appellants, upon the payment of the agreed purchase price.

NOTE.—Reported in 114 N. E. 218. See 36 Cyc 706; 118 Am. St. 598. Tender of payment of consideration as a condition precedent to a suit for the specific performance of a contract to convey realty consummated by the vendee's exercise of an option, 24 L. R. A. (N. S.) 91.